IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION

| | |
|---|---|
| JOSE GARCIA, ) | |
| ) | |
| Petitioner, ) | |
| ) | Case No. 03 C 6085 |
| v. ) | |
| ) | Judge Mark Filip |
| EDWIN R. BOWEN, ) | |
| ) | |
| Respondent. ) | |

## MEMORANDUM OPINION AND ORDER

Following a bench trial, Jose Garcia ("Garcia" or "Petitioner") was found guilty of two

counts of attempted first-degree murder and two counts of aggravated battery with a firearm.[1]

(D.E. 9, Ex. C at 1.)[2] The trial court sentenced him to seven years' imprisonment on each of the

attempted murder counts, to be served consecutively. (*Id.*) Garcia appealed, arguing the

following: (1) his guilt was not proven beyond a reasonable doubt because his conviction was

based on unreliable eyewitness identifications; (2) his attorney failed to provide effective

assistance of counsel; and (3) his consecutive sentences violated his due process rights. (*Id.*)

The Illinois appellate court affirmed Garcia's conviction (*id.*), and the Illinois Supreme Court

---

[1]  In the interests of accuracy and clarity, the Court notes that, according to the state appellate court opinion, Garcia was found guilty of two counts of attempted murder and only one count of aggravated battery with a firearm. (D.E. 9, Ex. C at 1.) The trial record, however, clearly indicates that Garcia was found guilty on two counts of attempted murder and two counts of aggravated battery. (D.E. 18, Ex. D at 5; D.E. 18, Ex. B at 158.) The question of whether Garcia was found to have been proven guilty of two counts, or only one count, of aggravated battery with a firearm, however, is of only academic significance in connection with this habeas corpus proceeding. Based on a single act rule, judgment and sentence were entered only on the two attempted murder counts. (D.E. 18, Ex. A. at 4; D.E. 18, Ex. D at 6.) Nonetheless, the trial judge clearly stated that Garcia was proven guilty on all four charges. (D.E. 18, Ex. B at 158 ("[T]he law requires a finding of guilty as to each count.").)

[2]  The various docket entries in this case are cited as "(D.E. __.)."

declined to review the matter (D.E. 9, Ex. E). Having exhausted his state court remedies and having preserved these claims, Garcia now petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons set forth below, the Court respectfully denies Garcia's habeas petition.

## I.    Background

### A.    Factual Background[3]

On October 8, 1998, at approximately 9:15 in the morning, Robert Ortiz ("Ortiz"), Leopoldo Castro ("Castro"), and Roberto Del Valle ("Del Valle") were on their way to school in a van driven by Castro. (D.E. 9, Ex. C at 2.) Due to heavy traffic, the van stopped near the intersection of North Milwaukee Avenue and North Western Avenue in Chicago. (*Id.*) The occupants of the van saw a group of men, including Petitioner, who was five feet tall and one hundred-twenty pounds, standing on the street corner. (*Id.* at 2, 8.) Petitioner, wearing a black sweater with a hood and dark pants, began flashing various gang signs towards the van. (*Id.*)

Garcia then approached the van and punched at the windows, trying to break them. (*Id.*) After repeatedly punching the windows and screaming at the occupants, he walked away from the van, back to the group of men, including an unidentified man on a bicycle who was wearing a brightly colored orange jacket. (*Id.*) The man with the bike pulled a gun from his waistband, and he gave the gun to Garcia. (*Id.*) Now armed with the gun, Garcia returned to the van and began shooting into the van through the windows at the occupants. (*Id.* at 2-3.) Del Valle was shot in

---

[3]      As indicated, the facts are taken primarily from the state appellate court order denying Garcia's appeal. (D.E. 9, Ex. C.) Later in this opinion, the Court will address whether the state courts' factual findings were infirm for purposes of habeas review. As explained, this Court does not reject any of the state court factual findings.

the back. Castro, who had left the van, was hit in the leg. (*Id.* at 3.) Ortiz was not injured in the encounter. After the shootings, Garcia variously was smiling and laughing at Del Valle, one of his victims, who had been shot in the spine. (D.E. 18, Ex. B at 16, 18, 113.)

Immediately after the shooting, Garcia fled north from the scene on foot, along with the man with the multicolored jacket, who fled on his bike. (D.E. 9, Ex. C at 3.) Castro briefly attempted to chase the perpetrators, but he was hindered by the gunshot wound to his leg. (*Id.*) Ortiz drove Castro and Del Valle to the hospital. (*Id.*) Del Valle was hospitalized and underwent surgery to remove the bullet from his spine. (*Id.*) Castro was treated for the injuries to his leg and released. (*Id.*) After arriving at the hospital, Ortiz and Castro each independently described the incident culminating in the shooting to the police. (*Id.*)

Soon after the crime was reported, police officers noticed a bike lying in front of a liquor store not far from the scene of the shooting. (*Id.*) Inside the store, a sales clerk told police that a man with a brightly colored jacket had gone into the restroom at the rear of the store. (*Id.* at 4.) As the officers walked toward the restroom, Garcia emerged and was arrested. (*Id.*) At the time of his arrest Garcia was wearing white pants and red shoes. (*Id.* at 7.) The police found a brightly colored jacket in the restroom, with six .38 caliber bullets in the jacket. (*Id.* at 4.) Later, five spent .38 caliber casings were recovered from the scene of the shooting. (*Id.*)

Within thirty to forty-five minutes of the shooting, the police brought Garcia to the hospital to be identified by the victims. (*Id.* at 3.) At the hospital, officers conducted separate show-up identification confrontations for Ortiz and Castro. (*Id.*) Both identified Garcia as the

gunman. (*Id.*) Due to his physical condition at the hospital, a show-up confrontation was not conducted for Del Valle.[4] (*Id.* at 8.)

A Cook County grand jury indicted Garcia in October 1998 on two counts of attempted first-degree murder and two counts of aggravated battery with a firearm. (D.E. 18, Ex. A at 8-12.) Garcia waived his right to a jury trial, choosing instead to have the trial judge decide his case. (*Id.* at 33.) At a trial beginning April 22, 1999, the state introduced Castro's and Ortiz's show-up identifications of Garcia. (D.E. 9, Ex. C at 5.) Castro, Ortiz, and Del Valle also made in-court identifications and testified to the foregoing events. (*Id.* at 2-5.)

Based primarily on the testimony of the identifying witnesses, the judge found that the State had proved Garcia guilty beyond a reasonable doubt of all charges. (*Id.* at 4.) On January 25, 2000, the trial judge sentenced Garcia to seven years imprisonment on each of the attempted murder counts, to be served consecutively. (*Id.* at 1.)

B.     Procedural Background

An applicant for writ of habeas corpus under 28 U.S.C. § 2254 ("Section 2254") must exhaust the remedies available in the State courts before a federal court can entertain a petition for a writ. 28 U.S.C. § 2254(b)(1). Exhausting all state remedies includes presenting each claim on direct appeal and in a petition to the state supreme court for discretionary review. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999). If the claims have been preserved through the state criminal appeals process, a prisoner in state custody must allege that he is being held in

---

4     Del Valle first identified Garcia as the gunman at trial, six months after the shooting. (D.E. 9, Ex. C at 8.)

violation of the Constitution or laws or treaties of the United States in order for a federal court to entertain an application for writ of habeas corpus. 28 U.S.C. § 2254(a).

In this case, Garcia presented three issues to the state appellate court on direct appeal: (1) that the identification evidence against him was impermissibly suggestive, (2) that his trial counsel provided ineffective assistance, and (3) that his due process rights, as guaranteed under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), were violated. The state appellate court denied Garcia's appeal on all three issues and affirmed his conviction. (D.E. 9, Ex. C at 25.) Garcia then presented the same three issues in a petition to the Illinois Supreme Court requesting review of his case. The Illinois Supreme Court declined to accept the case. (D.E. 9, Ex. E.) Garcia now comes to this Court making essentially the same allegations he did in state court (although, as explained below, his third claim is presented in such skeletal form in this Court that one might fairly conclude that claim is waived in this Court). Accordingly, Garcia sufficiently exhausted the remedies available in state court and may proceed with his claims here.

## II.    General Legal Standards

Garcia's habeas corpus petition is governed by 28 U.S.C. § 2254, subject to the applicable amendments of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). As amended, Section 2254(d) teaches that a federal court may only grant a habeas petition concerning a person in state custody if one of two conditions is satisfied. First, the writ is to be granted if adjudication of the claim in the state courts "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Second, a writ of habeas corpus should be granted when the state court proceedings "resulted in a decision that was based

5

on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

The "contrary to" provision pertains to issues of law, which are reviewed *de novo*. *Schaff v. Snyder*, 190 F.3d 513, 522 (7th Cir. 1999). A state court's decision is "contrary to" clearly established Supreme Court law if the state court applies a rule that contradicts the governing law, as set forth by the Supreme Court, or if the "state court confronts facts materially indistinguishable from a relevant Supreme Court precedent and arrives at [an opposite] result." *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000).

Under the "unreasonable application of" clause of Section 2254(d)(1), the Court defers to "a reasonable state court decision." *Anderson v. Cowan*, 227 F.3d 893, 896-97 (7th Cir. 2000) (citing *Schaff v. Snyder*, 190 F.2d 513, 522 (7th Cir. 1999)). As the Seventh Circuit has repeatedly instructed, the unreasonable application prong of Section 2254(d)(1) is "a difficult standard to meet." *Floyd v. Hanks*, 364 F.3d 847, 850 (citation omitted); *Jackson v. Frank*, 348 F.3d 658, 662 (7th Cir. 2003) (citation omitted); *see also Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002) (holding that "unreasonable," for the purpose of Section 2254(d)(1), means "something like lying well outside the boundaries of permissible differences of opinion").

"[W]hen a state-court decision unreasonably applies the law of [the Supreme] Court to the facts of a prisoner's case, a federal court applying § 2254(d)(1) may conclude that the state-court decision falls within that provision's 'unreasonable application' clause." *Williams*, 529 U.S. at 409. In this regard, the Supreme Court has repeatedly instructed that an unreasonable application of federal law is something more than simply an application that the habeas court might not itself have reached in the first instance or that the habeas court thinks is incorrect.

6

Thus, for example, in *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002), the Supreme Court explained the role a federal habeas court is to play:

> Under § 2254(d)'s 'unreasonable application' clause, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied *Strickland* incorrectly. Rather, it is the habeas applicant's burden to show that the state court applied *Strickland* to the facts of his case in an objectively unreasonable manner. An *unreasonable* application of federal law is different from an *incorrect* application of federal law. The Ninth Circuit did not observe this distinction, but ultimately substituted its own judgment for that of the state court, in contravention of 28 U.S.C. § 2254(d).

(internal citations and quotation marks omitted; emphases in *Woodford*); *accord, e.g., Williams*, 529 U.S. at 410 ("[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.").[5]

As to determining the underlying facts of a case, a federal court presumes that a state court's factual findings are correct. *See Schaff v. Snyder*, 190 F.3d 513, 521 n.5 (7th Cir. 1999). To overcome this presumption, a petitioner has the burden of rebutting the state court factual findings by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Schaff*, 190 F.3d at 521 n.5. Specifically, the Seventh Circuit teaches that this court is not to second guess the finder of fact "because the cold pages of an appellate record do not allow . . . [a district court] the

---

[5]        Although the Supreme Court has repeatedly instructed that there is a difference between merely an incorrect application of a Supreme Court precedent and an objectively unreasonable one (only the latter being enough to ground habeas relief), in this case the distinction is not material. *See Williams v. Taylor*, 529 U.S. 362, 365 (2000) ("[A]n unreasonable application of federal law is different from an incorrect application of federal law.").

opportunity to observe the verbal and nonverbal behavior of the witnesses, including their reactions and responses to the interrogatories, any confused or nervous speech patterns, their facial expressions, attitudes, tone of voice, eye contact, posture, fidgeting, perspiring, and body movements." *Gregory-Bey v. Hanks*, 332 F.3d 1036, 1048 (7th Cir. 2003) (collecting cases).

## III. Discussion

### A.    Claim 1: Garcia's Guilt Was Proven Beyond a Reasonable Doubt

Garcia appears to posit that the identifications provided by Ortiz, Castro, and Del Valle are so defective that they cannot sustain his guilt—as the trial court found to be the case beyond a reasonable doubt in finding Garcia guilty and as the Illinois appellate court affirmed. (D.E. 1 at 5.) Relying on *Jackson v. Virginia*, 443 U.S. 307 (1979), Petitioner asserts that each witness was precluded from making a truthful, accurate identification of him due to the specific events in question.

The Court respectfully disagrees. The evidence in the trial record consisted of medical records and testimony from four witnesses: the three identifying witnesses and one of the arresting officers, and the conviction appears to have rested primarily on the testimony of the three identifying witnesses. The testimony of the three identification witnesses (Ortiz, Castro, and Del Valle) was sufficient for the state court to find Garcia guilty beyond a reasonable doubt. Seventh Circuit precedent teaches that credible testimony of one identification witness is sufficient to support a conviction. *See, e.g.*, *United States ex rel. Wandick v. Chrans*, 869 F.2d 1084, 1089 (7th Cir. 1989) (collecting cases and holding that the "[c]redible testimony of one identification witness is sufficient to support a conviction"); *see also id.* ("As a federal habeas court, we have no license to redetermine the credibility of a witness whose demeanor has been

8

observed by a state trial court, and not by us"). In this case, there were at least two, and likely three witnesses whose identifications independently could have supported a conviction under applicable standards of review of the Illinois courts' entry and affirmance of the judgment of conviction.

The Court notes that, at the conclusion of the bench trial, the trial judge in rendering a verdict stated that "in effect this is an identification case." (D.E. 18, Ex. B at 155.) The trial court noted that the three occurrence/identification witnesses "all ha[d] an ample opportunity to observe the defendant." (*Id.* at 156.) The trial court also noted that the events in question happened in broad daylight and the witnesses each had an opportunity to observe the Petitioner as he was within "inches or feet from each of the three occupants of the van at various points in time." (*Id.*) The trial court noted that "[e]ach of these witnesses were certain in their testimony," "[t]hey each withstood vigorous cross-examination," and "[t]he identification testimony was not impeached in any [meaningful] way as to any of those witnesses." (*Id.* at 156-57.)

Petitioner specifically requested this Court to obtain a trial transcript and to review it so as to review the identification testimony. *See* D.E. 10 at 3 ("Make the State produce the record of proceedings!!!!!!!!!!!!!!"); *see also* D.E. 1 at 5 (requesting review of the record of proceedings). Although Petitioner did not present any compelling argument as to why this Court should review the entire record below, this Court did obtain the full transcripts from trial and post-trial proceedings and has reviewed them in their entirely. Of course, review of cold transcripts is an at-best imprecise way to assess the probativeness of trial testimony, as it does not allow the reviewer to see the witnesses and to assess their credibility from nearly as effective a perspective as the factfinder. (That factor is universally understood to counsel in favor of

9

deference to the factfinder, not aggressiveness towards the verdict below, and that deferential approach is, if anything, even more appropriate under applicable standards for federal habeas review. *See, e.g., Wandick*, 869 F.2d at 1089.)

After having reviewed the trial transcripts, this Court notes that the trial judge's assessment of the evidence seems entirely reasonable and correct. As the trial judge noted, each of the witnesses had clear opportunities, at point-blank range, to view the Petitioner as he was variously shooting at them. (*See, e.g.*, D.E. 18, Ex. B at 8, 12-14, 16, 18, 49, 52, 72, 84-85, 87-90, 113.) Their identifications were clear. Petitioner cites to disparate places in the record where the witnesses conceded they were not looking at him—but those citations are, at best, misleadingly incomplete. To be sure, at certain discrete periods of times, each of the witnesses was not looking at Petitioner—for example, when he was shooting at them and they were attempting to hide. However, they each saw him in broad daylight at immediate range before and after the shooting—for example, when Petitioner was standing over Del Valle (whom Petitioner had just shot and who had a bullet then lodged in his spine) as Petitioner was laughing and/or smiling at him. (*See, e.g., id.* at 16, 18.) There is no serious argument that the witnesses did not have clear and point-blank views of Garcia. His arguments, which largely are predicated on his claims that the witnesses could not see him accurately, are accordingly misplaced at their foundation.

The Court will address Petitioner's more particularized arguments in greater detail below, but in summary, the identification witnesses had an ample opportunity to view Petitioner, and the trial court was well within the bounds of reason in crediting their testimony. As such, this federal habeas court has no basis to disturb the verdict below.

10

1.    The Illinois Appellate Court Applied The Correct Standard

Under *Neil v. Biggers*, 409 U.S. 188 (1972), consideration of the totality of the circumstances, with emphasis on the following five factors, determines whether the likelihood of misidentification was so great as to implicate due process concerns: (1) the witness's opportunity to view the perpetrator committing the crime; (2) the witness's degree of attention on the perpetrator during commission of the crime; (3) the accuracy of the witness's description of the perpetrator to police; (4) the witness's degree of certainty at the identification; and (5) the amount of time between the crime and the identification encounter. *Biggers*, 409 U.S. at 199-200; *see also Manson v. Brathwaite*, 432 U.S. 98, 114 (1977) (applying the *Biggers* factors). The state appellate court viewed the *Biggers* factors as the governing law and applied those factors to the facts of Garcia's case to affirm his conviction on the basis of the identification testimony. (D.E. 9, Ex. C at 6.) The opinion considered all five factors, concluding that each factor supported the reliability of the identifications. (*Id.* at 6-11.) Therefore, the state appellate court applied a standard consistent with federal law in affirming Garcia's conviction.[6]

In addition to its consideration of the *Biggers* factors, the state courts noted that an

---

[6]    The State does not argue that there should be no review under *Biggers* at all, notwithstanding that *Biggers* would appear to be appropriate to assess whether there is an improper risk of misidentification in the wake of the use of improper identification procedures by the government. *See generally, e.g., United States v. Rogers*, 387 F.3d 925, 937-38 (7th Cir. 2004) (stating that, "[h]aving determined the identification procedure to be unduly suggestive, we must consider whether, under the totality of the circumstances, . . . [the witness's] in-court identification was reliable despite" the unduly suggestive measures, through application of the "so-called '*Biggers* factors'"). If there was no improper identification procedures employed by the government (and the Illinois appellate court certainly did not find that any improper identification procedures were used), then one might argue that the *Biggers* analysis is inapposite. Because the State takes no objection to review of the identification testimony under *Biggers*, however, the Court will proceed consistent with the more-exacting review used by the appellate courts of the State of Illinois in affirming the conviction.

11

important factor "in terms of evaluating the identification testimony in this case was the distinctive appearance of the defendant." (*Id.* at 8.[7]) In this regard, this Court cannot find unreasonable the state courts' taking account, in evaluating the reliability of identification testimony under the totality of the circumstances presented, of the practicalities of Garcia's atypical appearance (he is an adult male who is 5' tall and weighed 120 pounds) when deciding the likely reliability of the witnesses' identifications. *See id.* An accurate description will include at least some distinguishing characteristics: for instance, sex, height, weight, skin color, or hair color. While the degree of distinctiveness should not be confused with the degree of accuracy of the description, distinctive characteristics will inherently be those that tend to be included in an accurate description. Therefore, the state courts' reliance on this factor in addition to the five *Biggers* factors was not contrary to federal law.

      2.     The Illinois Appellate Court's Determination of The Facts, After Applying *Biggers*, Was Not Objectively Unreasonable

The Court interprets Garcia's petition and response to argue that the trial court unreasonably accepted the identifications of Petitioner as the shooter in the instant case. Specifically, Petitioner argues that each identification bore infirmities that rendered it unreliable. For example, Garcia cites to Ortiz's testimony on cross-examination that he could not see the gunman's face when the shooting occurred. (D.E. 1 at 5a.) He also attempts to minimize Castro's identification by relying on his testimony that the shooting took only a few seconds, that

---

     [7]     *See also* D.E. 18, Ex. B at 158 ("In this circumstance the defendant's appearance is unique. Extremely unique. He is a person, there are types of person that when you take a look at him he is distinctive, particularly because of his height. You will remember him and recall him when you see him again which is what happened in the show up confrontation, [and] also in court.").

the gunman never looked at him while he was actually shooting, and that Castro was not in a position at one point to get a good look at the shooter, since Castro was on the floor of the van, ducking, when the shots were fired. (*Id.* at 5b.) Finally, Garcia challenged the state court's reliance on Del Valle's testimony because of Del Valle's testimony that he had various mental health issues and had smoked marijuana just before the shooting. (*Id.* at 5c.)

In dealing with Petitioner's concerns regarding the reliability of identification testimony, the state court dutifully employed the process laid out in *Biggers*. (D.E. 9, Ex. C at 6.) As to the first factor, the opportunity that the victim/witnesses had to view the shooter at the time of the crime, the three identifying witnesses each had a clear opportunity to view the shooter, whom they all identified as Garcia. (*Id.*, Ex C at 9.) The witnesses' encounter with Garcia, including the time it took for them to watch him flash various gang signs, walk over to their van, pound on their van repeatedly, walk back over to his friends to get a gun, and then return to the van to shoot at them, must have lasted at least a couple of minutes. (*See id.*) In addition, as already noted, after Garcia had shot two of the three men, he stood over the most-seriously injured, Del Valle, and laughed and/or smiled at him, during which time he also could be viewed. (*See, e.g.*, D.E. 18, Ex. B at 16, 18.) As the Illinois courts noted, the event took place in broad daylight. (*Id.* at 155-57; D.E. 9, Ex. C at 2.) Under the circumstances, there was certainly sufficient time for the witnesses to view the shooter so as to be able to identify him as Garcia. (*Accord id.*; D.E. 18, Ex. B at 155-57.)

Second, it was certainly not unreasonable to conclude that the witnesses' attention would have been sufficiently focused on Garcia to identify him reliably—indeed, one posits that Garcia likely had their undivided attention for much of the encounter. Garcia's approaching the van

twice in a threatening manner and attracting their attention by banging on the van's windows before getting a gun and firing at the witnesses was sufficient behavior to attract and maintain the attention of Ortiz, Castro, and Del Valle. (D.E. 9, Ex. C at 6-7.) In other words, the witnesses' "degree of attention to the incident was high—[they] were being shot at," and they also had their van attacked by an assailant within an arm's reach of them. *Kosik v. Napoli*, No. 83 C 9138, 1985 WL 220, at *5 (N.D. Ill. Jan. 7, 1985) (Moran, J.) (concluding that a witness's identification testimony was sufficiently reliable under the *Biggers* factors where the witness dropped to the ground after being shot at); *accord, e.g., McFowler v. Jaimet*, 349 F.3d 436, 449 (7th Cir. 2003) (applying *Biggers* factors and stating that "it is fair to assume that she [the witness] looked at the man with the shotgun with a high degree of attention").

The state appellate court devoted much of its attention to analyzing the third factor—the accuracy of the witnesses' description of the perpetrator—because much of the Defendant's argument was directed to it. (D.E. 1 at 5; D.E. 10 at 2-3.) The state court recognized some potential discrepancies between the description of the perpetrator that the police were looking for and the witnesses' testimony describing the perpetrator—such as the color of the shooter's pants.[8] (D.E. 9, Ex. C at 7-8.) Garcia also argues that the description was not accurate because

---

[8]     This Court acknowledges that some potential incongruities existed in the descriptions and as compared to Garcia. As anyone who has practiced in the criminal law arena can attest, such incongruities and tensions exist in more cases than not. In this case, the trial court was not unreasonable in resolving those limited incongruities and finding Petitioner guilty. In light of the high degree of deference this Court gives to state court decisions pursuant to the AEDPA, these inconsistencies are not material. Even if this Court simply had some doubt about the accuracy of the trial judge's verdict (which it does not, because, as previously stated, a review of the cold record strongly suggests that the trial judge was right, not wrong), that doubt would not justify upending the judgment of the state courts. *See McFowler v. Jaimet*, 349 F.3d 436, 438 (7th Cir. 2003) ("In view of the irreconcilable inconsistencies in Meredith's own testimony, we share the district court's doubts about the reliability of her identification. . . . However, the

14

he has a crossed eye that was not included in the description. However, slight discrepancies or omissions in the descriptions are inherent in multiple witness identifications and do not by themselves create a reasonable doubt of a defendant's guilt, particularly when, as the trial court stated, the defendant has a distinctive size for an adult male (5'0" tall and 120 pounds) and a distinctive appearance (D.E. 18, Ex. B at 158). Therefore, the appellate court was within its realm of discretion to give little weight to this factor, especially when considering the totality of the circumstances, since the remaining four factors cut strongly against Garcia. *See McFowler*, 349 F.3d at 455 (explaining that AEDPA requires such deference to state court decisions that even when a federal habeas court has doubts or disagreements with a petitioner's conviction, it cannot grant the writ unless the decision of the state courts was "well outside the bounds of permissibly acceptable differences").

Fourth, Ortiz and Castro made unwavering identifications of the defendant at the show-up, and all three witnesses exhibited a high degree of certainty in court. (D.E. 18, Ex. B at 157 ("Each of these witnesses were certain in their testimony.").) The witnesses also testified to their

---

[AEDPA] commands great deference to the decisions of state courts. Because we cannot say that the Illinois Appellate Court was objectively unreasonable in holding that Meredith's testimony provided sufficient support for McFowler's conviction, we are compelled to reverse the grant of McFowler's petition for a writ of habeas corpus."). (In *McFowler*, aspects of the identification testimony of the witness were "nonsensical" and the witness had "identified someone else" "either in addition to or instead of" the habeas petitioner "in the context of a non-suggestive lineup conducted hours after the crime." 349 F.3d at 445. In trial testimony, the *McFowler* witness also "contradicted her own initial testimony," and later "gave an answer that makes no sense on the facts." *Id.* at 454. Notwithstanding that these defects related to the core of the witness's identification testimony, *id.*, the Seventh Circuit found that it was improper under applicable standards of habeas review to reverse the state court conviction. *Id.* at 438, 456.) The Court also notes that any inconsistencies in the testimony in Garcia's case were issues of credibility to be determined (as they were) by the finder of fact, and the resulting determinations are presumed to be correct. *See* 28 U.S.C. § 2254(e); *see also Wandick v. Chrans*, 869 F.2d 1084, 1089 (7th Cir. 1989); *Jones v. Chrans*, 187 F. Supp. 2d 993, 1008 (N.D. Ill. 2002).

extended viewings of Garcia. For example, on direct examination Ortiz testified that he saw

Garcia standing on the street corner throwing out gang signs (*id.*, Ex. B at 9); punching the

windows of the van occupied by Ortiz, Castro, and Del Valle (*id.*, Ex. B at 10); taking a gun from

another person on the street corner (*id.*, Ex. B at 12); and approaching the van with the gun (*id.*,

Ex. B at 13-14). Similarly, although Castro testified that Garcia never looked at him while he

was shooting, Castro testified that he saw Garcia approaching the van (*id.*, Ex. B at 47-48),

punching the windows of the van (*id.*, Ex. B at 49), taking a gun from a guy on a bike (*id.*, Ex. B

at 52), and running towards the van with the gun (*id.*, Ex. B at 55).

As for Del Valle, as the state appellate court noted, the testimony of the other two

identifying witnesses was sufficient to convict Garcia, even if one assumes *arguendo* for present

purposes that Del Valle's testimony was unreliable—a subject that will be discussed at greater

length in a moment. (D.E. 9, Ex. C at 11.) Del Valle's testimony, however, certainly

corroborated the testimony of the other two identification witnesses. Del Valle unequivocally

identified Petitioner at trial and had extended opportunities to observe Garcia. (D.E. 18, Ex. B at

157.)

At bottom, the state courts made an objectively reasonable application of the five *Biggers*

factors to the facts of Garcia's case. Precedent teaches that the identification of an individual by

a single eye-witness is sufficient to support conviction, *see, e.g., Wandick*, 869 F.2d at 1089, and

in this case, there was reliable identification testimony from at least two witnesses (Castro and

Ortiz), even if one completely discounts the testimony of Del Valle. (The Court does not suggest

that throwing out the testimony of Del Valle, which will be discussed in detail below, is

necessary; however, even if Del Valle's testimony is afforded no weight whatsoever, there is no

basis under applicable standards of review to disturb the judgment of the Illinois courts.)

Fifth, the brief period of time between the commission of the crime and the show-up confrontations—approximately thirty to forty-five minutes—supports the reliability of the identifications.[9] *Compare Biggers*, 409 U.S. at 201 (explaining that lapse of seven months between crime and show-up would ordinarily be a negative factor). The state court found that the time period supported a determination of reliability; this Court agrees, and in any event it cannot conclude that the appellate court was unreasonable in its conclusion regarding the fifth factor.

Additionally, while this Court recognizes that a line-up is typically more reliable than a show-up identification, a show-up does not necessarily violate one's due process rights. *See Biggers*, 409 U.S. at 198-99 (holding evidence of a show-up identification admissible even where a line-up could have been arranged). Admittedly, show-up procedures have been condemned at times for their potential to render unreliable or mistaken identifications. *United States v. Funches*, 84 F.3d 249, 254 (7th Cir. 1996). However, the Seventh Circuit teaches that they may be appropriate, and even preferable, in certain instances. Such instances include situations where "exigent circumstances" exist, or when certain interests are served, such as when a show-up will "'allow identification before the suspect has altered his appearance and while the witness' memory is fresh, and permit the quick release of innocent persons.'" *Id.* (quoting *United States*

---

[9]     Del Valle was being treated for his gunshot wounds at the time police conducted show-ups for Ortiz and Castro. Consequently, the police did not ask Del Valle to identify the perpetrator in a show-up. Del Valle first identified Garcia as the gunman at trial, six months after the crime. If Del Valle had been the only identifying witness, a six month delay may well have been more of a concern. As the evidence stands, the testimony of Ortiz and Castro alone would have been sufficient to uphold Garcia's conviction. Del Valle's testimony merely further corroborates the testimony of those two witnesses.

v. *Sleet*, 54 F.3d 303, 309 (7th Cir. 1995)); *see also Sanders v. Detella*, 814 F. Supp. 690, 696

(N.D. Ill. 1993) (Aspen, J.). As a result, "such considerations will justify a show-up in a limited

number of circumstances, such as where the police apprehend a person immediately after the

crime and in close proximity to the scene." *Funches*, 84 F.3d at 254. Because the hypothetical

scenario envisioned by the Seventh Circuit to justify a show-up is exactly that which occurred in

the instant case, the Court finds no inherent problem with the show-up procedure having been

used here. Garcia was apprehended within thirty minutes of the commission of the crime. The

witnesses' memories of the crime were fresh in their minds immediately after the shooting. If the

police had arrested the wrong person, it would have been paramount to be able to release that

person as speedily as possible. Petitioner was brought to the hospital to be viewed by the

victims of the attack, and two of the three victims were independently able to view and to

identify him; the third victim was in surgery at the time and was not able to participate in the

show-up viewings. (D.E. 9, Ex. C at 3.) Under these circumstances, the Court cannot conclude

that the appellate court's assessment of the facts was unreasonable.

Before concluding this area of analysis, the Court will address the testimony of Del Valle,

one of the victims in the shooting. Del Valle did not participate in the show-up viewings because

he was in surgery when Garcia was brought to the hospital. (*See, e.g.*, D.E. 9, Ex. C at 8.) After

trial, Del Valle initially recanted his testimony and then recanted his recantation. (D.E. 18, Ex. B

at 211, 214, 216, 235-36.) The trial judge held a post-trial hearing, at which Del Valle testified,

and found that Del Valle's recantation was motivated, as Del Valle explained, by his fear of

having testified against Petitioner. (*See id.*, Ex. B at 235 ("The court finds that for whatever

reasons, real or imagined, he [Del Valle] is, in fact, scared. That was the motivation for his

18

taking steps after trial."[10]) The trial court also found that the initial "recantation is not believable," and that Del Valle's fear "was the motivation for him coming forward after trial." In his post-trial testimony, Del Valle affirmed his trial testimony implicating Petitioner. (*See id.*, Ex. B at 218 ("Oh, I didn't lie when I testified").) The trial court, which saw Del Valle testify on all occasions, is not forbidden from crediting Del Valle's initial and final testimony and discounting the interim recantation because it was, in the trial court's view and according to Del Valle's testimony, motivated by fear. *See, e.g., Trejo v. Hulick*, 380 F.3d 1031, 1033 (7th Cir. 2004) (finding that strength of witness's testimony was unaffected by a recantation that was "easily explained" by witness's fear for his family as a result of testimony); *People v. Fields*, 552 N.E. 2d 791, 801-02 (Ill. 1990) (stating that recantation of trial testimony "is generally regarded as unreliable," and holding that trial judge was not required to accept recantation of trial testimony because "it is for the trial judge to determine the credibility of the recantation testimony after having observed the demeanor of the witness") (citations omitted). Under the circumstances presented, the trial court's conclusion that Del Valle's recantation was motivated by fear and was not credible does not preclude consideration of Del Valle's incriminating testimony—although, even if one entirely discounted Del Valle's testimony, the unequivocal identification testimony of the other two witnesses would support the judgment of the Illinois courts.

For the reasons stated above, the identification testimony was sufficiently reliable to

---

[10]     It was not alleged that Garcia or any confederate actually threatened Del Valle. Nonetheless, Del Valle testified, and the trial court credited the testimony, that Del Valle's initial recantation was motivated by fear of the potential consequences of offering testimony against Garcia. (*See, e.g.,* D.E. 18, Ex. B at 216 ("I just said that because I was scared.").)

support the conviction under applicable standards of habeas review. Therefore, the Court finds that Garcia's guilt was sufficiently proven beyond a reasonable doubt.

B.     Claim II: Garcia Was Not Denied Effective Assistance of Counsel

Garcia's second argument is that his trial counsel's performance denied him effective assistance of counsel. Specifically, he maintains that his counsel was defective because he failed to file a pretrial motion to suppress the show-up identifications made at the hospital. (D.E. 1 at 5.) Garcia further posits that since Del Valle never made an out-of-court identification, but rather only made an in-court identification of him (*id.*), "[n]o reasonable-minded attorney would forego filing a motion to suppress," which had a "reasonable likelihood" of being granted (D.E. 10 at 4). Respondent concedes that this claim has been properly preserved throughout the state appellate process. (D.E. 8 at 10.)

To receive habeas relief on this claim, Garcia must show that the appellate court either applied the wrong United States Supreme Court standard to the ineffective assistance of counsel claim or applied the correct standard in an objectively unreasonable manner. *See* 28 U.S.C. § 2254(d)(1); *Bell v. Cone*, 535 U.S. 685, 694 (2002). In determining reasonableness, this court must afford great deference to the state court's application of the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Murrell v. Frank*, 332 F.3d 1102, 1111 (7th Cir. 2003). As the Seventh Circuit has repeatedly instructed, "'*only a clear error* in applying *Strickland* would support a writ of habeas corpus,'" *id.* (quoting *Dixon v. Snyder*, 266 F.3d 693, 700-01 (7th Cir. 2001) (emphasis in *Murrell*), such that the assessment of the state courts' regarding *Strickland* was not even "'minimally consistent with the facts and circumstances of the case.'" *Id.* at 1112 (quoting *Sanchez v. Gilmore*, 189 F.3d 619, 623 (7th Cir. 1999)). Furthermore, a

20

federal habeas court must presume that all the state court's factual determinations, including credibility determinations, are correct, unless rebutted by clear and convincing evidence. *Id.* at 1112.

In *Strickland*, the Supreme Court established the framework under which claims of ineffective assistance of counsel are analyzed:

> First, the defendant must show that counsel's performance was deficient. This requires showing that the counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a . . . a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.*, 466 U.S. at 687.

To satisfy the first prong, Petitioner would need to show that defense "'counsel's representation fell below an objective standard of reasonableness.'" *Gallo-Vasquez v. United States*, 402 F.3d 793, 798 (7th Cir. 2005) (quoting *Strickland*, 466 U.S. at 688)). The Seventh Circuit teaches that when considering the effectiveness of an attorney's performance, a district court must "'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Id.* (quoting *Strickland*, 466 U.S. at 689). A defendant "must direct . . . [the Court] to the specific acts or omissions which form the basis of his claim. The court must then determine whether, in light of all the circumstances, the alleged acts or omissions were outside the wide range of professionally competent assistance." *Fountain v. United States*, 211 F.3d 429, 434 (7th Cir. 2000) (internal quotation marks and citation omitted).

Courts are to "indulge a strong presumption" of competence such that "the defendant

must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (internal quotation marks and citation omitted). A court should not simply second-guess a defense counsel's assistance after a conviction or adverse sentence has occurred, because the benefit of hindsight is likely to distort the complexity of the challenges presented and the reasonableness of a counsel's decision on a real-time basis. *See id.* ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight . . . . Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ."). Most criminal cases result in convictions; that does not mean that most defense counsel are acting in a constitutionally deficient or unreasonable manner. *See, e.g., Fountain*, 211 F.3d at 434 ("[M]any trial determinations, like so many other decisions that an attorney must make in the course of representation, are a matter of professional judgment. Thus, we must resist a natural temptation to become a 'Monday morning quarterback.'") (internal punctuation and citations omitted).

For purposes of the second prong of the *Strickland* analysis, a petitioner must demonstrate prejudice by some "'reasonable probability.'" *Gallo-Vasquez*, 402 F.3d at 798 (quoting *Strickland*, 466 U.S. at 694). Put differently, Petitioner must demonstrate "'a probability [of prejudice] sufficient to undermine confidence in the outcome'" of the case. *Id.* (quoting *Strickland*, 466 U.S. at 694). This probability is determined under the totality of circumstances. *See Strickland*, 466 U.S. at 695. This standard does not require the petitioner to convince the court that his attorney's ineffectiveness more likely than not altered the outcome in the case. *Id.* at 693.

1.     The Illinois Appellate Court Applied The Correct Standard

Both parties acknowledge that the standard governing Garcia's ineffective assistance of counsel claim is established by *Strickland*. (D.E. 10 at 3; D.E. 8 at 10.) In making its determinations, the state appellate court clearly identified *Strickland* as the governing legal standard and applied that standard to the claim. (D.E. 9, Ex. C at 12-18.) Thus, if Petitioner has any hope of prevailing on his ineffective assistance of counsel claim, he must establish that the appellate court's application of *Strickland* was objectively unreasonable. As explained below, he has failed to do so with respect to either *Strickland* prong.

2.     The Illinois Appellate Court's Application of *Strickland* Was Not Objectively Unreasonable

Garcia argues that the appellate court's application of *Strickland* was objectively unreasonable with regard to both prongs of the *Strickland* test. (D.E. 10 at 3-4.) In regard to the first prong, Garcia argues that his counsel's performance was objectively unreasonable because he failed to file a motion to suppress show-up identifications of petitioner by Castro and Ortiz,[11] despite the fact that both witnesses testified to having limited or no view of the shooter during the shooting. (D.E. 3 at 2.) Garcia next argues that he was prejudiced by his counsel's ineffective assistance because there is a reasonable likelihood that a motion to suppress the show-up identifications would have prevailed if made and because the state would have had "great reluctance to proceed with a trial" without that evidence because the witnesses had no clear

---

[11]     Petitioner notes, and this Court accepts, that Del Valle's identification of Garcia was not a show-up identification and therefore is irrelevant to assess counsel's purported ineffectiveness. (D.E. 10 at 4.) The Court also notes, however, that the existence of Del Valle's independent identification is relevant to disproving Garcia's claim because it is probative of the second *Strickland* prong, a lack of prejudice to Garcia's case.

chance to observe the shooter and therefore could not have identified him. (*Id.* at 4.) The Court will address these two contentions in greater detail below, but again, they are fundamentally predicated on the false premise that the witnesses had limited chances to see Garcia during the shooting episode and the events surrounding it. That premise is baseless and effectively defeats Garcia's argument on its own.[12]

        a.     Petitioner's Trial Counsel Was Not Defective

The decision whether to file a motion to suppress is usually considered a matter of trial strategy that will be given substantial deference against second-guessing. *See, e.g., Wilson v. Schomig*, 234 F. Supp. 2d 851, 871 (C.D. Ill. 2002) ("As a general rule, trial counsel's failure to file a motion [to suppress statements] does not establish incompetent representation, especially when that motion would be futile. Whether or not to file a motion is a matter of trial strategy which will be accorded great deference.") (internal quotation marks and citation omitted); D.E. 9, Ex. C at 13. There is no obligation to pursue a strategy that is inherently futile or unlikely to succeed. *See, e.g., Wilson*, 234 F. Supp. 2d at 871; D.E. 9, Ex. C at 17-18. The appellate court highlighted the strategic posture of deciding whether the file a motion to dismiss and accorded the trial counsel's decision not to pursue it the requisite amount of deference. (D.E. 9, Ex. C at 13.)

---

[12]     As previously explained, and as the trial court found, the witnesses had ample opportunities to witness Petitioner during the events surrounding the shootings. There were segments of time that each witness did not or could not see Petitioner; however, each witness had an extended chance to see Petitioner at extremely close range in broad daylight during the shooting episode and events surrounding it, and each witness unequivocally identified Garcia. *Accord* D.E. 18, Ex. B at 155-58 (bench verdict).

The appellate court noted that Petitioner's trial counsel could reasonably decide not to file a motion to suppress because multiple factors indicated that it would have been denied and thus would have been futile. (*Id.*, Ex. C at 17-18.) In general, the decision whether to conduct a show-up identification often turns on several issues, including whether such an identification may occur "before the suspect has altered his appearance" or where the witness's memory is fresh. *See Funches*, 84 F.3d at 256. In this case, the one-person show-up identification of Petitioner was inherently reasonable and appropriate, since it occurred so soon after the incident. The show-up of Petitioner was also done independently with both Ortiz and Castro (D.E. 9, Ex. C at 16), so they did not affect each other in their identifications. In addition, the crime involved was a shooting episode with two victims that needed medical treatment. While neither of the victims suffered fatal wounds (one, Del Valle, was far more seriously hurt than the other), Garcia offers no authority to suggest that law enforcement authorities are required to "hope for the best" after point-blank shootings of victim-witnesses if there is a reasonable chance to present a suspect to those victims while they are still sentient so as to attempt to prove or disprove whether a suspect was involved. *See generally People v. Nolden*, 414 N.E.2d 1124, 1131 (Ill. App. Ct. 1980) (affirming admission of identification testimony and use of show-up at hospital with shooting victim). This Court cannot conclude that the Illinois Appellate Court was objectively unreasonable in concluding that Garcia did not establish *Strickland* error under the circumstances.

Moreover, as stated by the appellate court after considering the *Biggers* factors, the show-up and in-court identifications of Garcia were reliable, and hence unlikely to be excluded, even if

the show-ups in this case were somehow suspect, which they are not.[13] In brief recapitulation,

Ortiz and Castro had ample opportunity to view Garcia in the commission of his crimes and were

motivated to pay close attention to him. Additionally, Garcia's attack—or, more precisely,

attacks—on the van containing Castro, Del Valle, and Ortiz took place during daylight hours, and

Garcia stood mere inches to feet from the van and its occupants. (D.E. 9, Ex. C at 15.) Further,

the court pointed to several factors indicating that the show-up procedure was proper, including:

(1) the immediate identification was necessary for the police to determine whether or not to

continue their search; (2) the witnesses identified the shooter separately from one another; and

(3) the witnesses were certain in their identifications. (*Id.* at 15-16.) Given the apparent

reasonableness of the show-up identification, it was not deficient for Petitioner's trial counsel not

to move to suppress it. Moreover, and more to the point for present purposes, it certainly was not

unreasonable for the appellate court to come to that conclusion in its application of *Strickland*

and therefore this Court has no warrant to disturb the judgment of the Illinois courts. *See*

*Murrell*, 332 F.3d at 1111-12; *United States v. Newman*, 144 F.3d 531, 536 (7th Cir. 1998).

> b. Trial Counsel's Failure to File a Motion to Suppress Did Not
> Prejudice Petitioner

Even if Petitioner succeeded in demonstrating the trial counsel's failure to move to

suppress was deficient under the performance prong of *Strickland*—which he did not—the Court

must determine whether Petitioner adequately demonstrated that the state appellate court's

application of the second prong of the *Strickland* test was unreasonable. *See Harding v.*

---

[13]      The Court notes that the criminal defendant/petitioner bears the burden of
showing that an identification procedure was unduly suggestive and inherently unreliable. *See*
*United States v. Rogers*, 387 F.3d 925, 936 (7th Cir. 2004); *United States v. Newman*, 144 F.3d
525, 535-36 (7th Cir. 1998); *United States v. Donaldson*, 978 F.2d 381, 385 (7th Cir. 1992).

*Stearnes*, 380 F.3d 1034, 1045-46 (7th Cir. 2004). Petitioner relies primarily on a two-sentence, conclusory allegation that "[a] reasonable likelihood exist [sic] that had counsel filed the motion to suppress it would have been granted, especially since the trial testimony of Robert Ortiz and Leo Castro clearly establish that they did not see the face of the shooter . . . ." (D.E. 10 at 4.) After reviewing Petitioner's argument against the *Strickland* prejudice standard, the Court respectfully rejects Petitioner's position and finds that he has failed to satisfy his burden. Again, this argument is fatally flawed because the identification witnesses' testimony made clear that they did see Garcia throughout the shooting.

In addition, in finding that Garcia was not prejudiced by the lack of a motion to suppress, the appellate court noted that, in light of the aforementioned *Biggers* factors, such motion, if made, would have been denied. (D.E. 9, Ex. C at 17-18.) Moreover, even if the show-up identifications made by Ortiz and Castro had been suppressed, they made unequivocal in-court identifications. Given the totality of the circumstances, including the prolonged period immediately before the shooting in which Castro and Ortiz did view Garcia, the Illinois courts reasonably found that Castro's and Ortiz's independent identifications of Garcia were reliable and that Garcia failed to show prejudice. *See, e.g., Murrell*, 332 F.3d at 1111-12.[14]

---

[14]    As the Illinois appellate court noted, Del Valle also identified Garcia as the shooter, and the Illinois appellate court stated that the outcome of the trial would have been "the same even if Mr. Ortiz's and Mr. Castro's pretrial and trial identifications of the defendant had been suppressed." (D.E. 9, Ex. C at 18.)  This Court explained that one can entirely discount Del Valle's testimony and still have sufficient evidence to support the conviction, but this Court did not find that such a step is mandated.  The Court also has no basis to reject the Illinois Appellate Court's finding in this regard. *See, e.g., Murrell v. Frank*, 332 F.3d 1102, 1111-12 (7th Cir. 2003) (collecting cases).

The appellate court's two independent *Strickland* determinations—that Garcia's trial counsel's decision not to file a motion to suppress was objectively reasonable, and that Garcia was not prejudiced by that decision (D.E. 9, Ex. C at 17-18)—are consistent with the facts of the case and thus, neither is clearly erroneous. Furthermore, Garcia has not rebutted the facts underlying those findings, much less by clear and convincing evidence. The Illinois appellate court's application of both *Strickland* prongs is not objectively unreasonable, and habeas relief is therefore denied. *See, e.g., Murrell*, 332 F.3d at 1111-12.

C.  Claim III: Garcia's Consecutive Sentences Did Not Violate His Due Process Rights

Petitioner appears to make a third, albeit skeletal, argument. Namely, he asserts that his consecutive sentences for two separate counts of attempted murder violated his due process rights as explicated in *Apprendi*. The entire treatment of this claim in his filings before this Court is a single sentence: "The Petitioner assert [sic] that his consecutive sentences violates *Apprendi* in that such matter was not submitted to a jury and not proven beyond a reasonable doubt." (D.E. 1 at 6.) Petitioner does not discuss the point at all in his reply. (D.E. 10.) Given the scant nature of the argument, and Petitioner's apparent abandonment of the point, one could fairly argue that the argument is insufficiently developed so as to be waived under Seventh Circuit law. *See, e.g., F.T.C. v. World Media Brokers*, 415 F.3d 758, 766 (7th Cir. 2005) ("'Perfunctory or underdeveloped arguments are waived.'") (quoting *Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir.2005)).

In any event, and independently, the argument is baseless. The Seventh Circuit has rejected arguments equivalent to Petitioner's on numerous occasions. *See, e.g., United States v.*

*Noble*, 299 F.3d 907, 909 (7th Cir. 2002) (affirming trial court's decision to impose consecutive sentences against *Apprendi* challenge, where total sentence was less than combined maximum term for counts of conviction); *see also id.* ("'[E]very court of appeals believes that consecutive sentences are lawful if the district judge chooses to impose them'") (quoting *United States v. Knox*, 287 F.3d 667, 669 (7th Cir. 2002)).

To begin, an *Apprendi* challenge is difficult to see in the context of this case, where, by the time the trial court considered the issue of sentencing and imposed consecutive sentences, Garcia had already waived his right to a jury and had been found guilty by the trial court. (*See* D.E. 18, Ex. A at 33.) Moreover, and independently, the Illinois appellate court did not err in affirming a combined sentence of fourteen years—seven years for each of two counts of attempted first degree murder to run consecutively. (D.E. 9, Ex. C at 1.) *Apprendi* held that under the Sixth Amendment to the United States Constitution, any fact (other than the existence of a prior conviction) that increases the penalty for a crime beyond the prescribed statutory maximum sentence must be submitted to a jury and proven beyond a reasonable doubt. *See Apprendi*, 530 U.S. at 489; *see also Noble*, 299 F.3d at 909 (affirming trial court's decision to impose consecutive sentences, where total sentence was less than combined maximum term for counts of conviction); *Thomas v. Hinsley*, 379 F. Supp. 2d 924, 925 (N.D. Ill. 2005). In the five years since *Apprendi*, the Seventh Circuit has explored its parameters. In one of its recent examinations of *Apprendi*, the Seventh Circuit considered the subject of consecutive sentences and concluded that the *Apprendi* rule is not violated by a judgment for consecutive sentences for separate offenses, where both offenses have been properly charged and submitted to a jury (or a judge, if the right to a jury trial has been waived), as long as the combined sentence does not

exceed the combined statutory maximum for all counts on which a defendant has been convicted. *See Noble*, 299 F.3d 909-10 (collecting cases). Numerous district courts have followed this reasoning with respect to habeas claims such as the one advanced by Garcia here, *see, e.g., Thomas*, 379 F. Supp. 2d at 925-26 (rejecting habeas claim and stating that "consecutive sentences do not violate *Apprendi* so long as the combined sentence does not exceed the combined statutory maximum for all counts on which a defendant has been convicted") (citing *Noble*, 299 F.3d at 909-10); *Dyse v. Hinsley*, No. 03 C 4147, 2004 WL 2318848, at *2 (N.D. Ill. Oct. 12, 2004) ("The Seventh Circuit has clearly stated that *Apprendi* is not violated by the imposition of consecutive sentences . . . .") (citing *Noble*, 299 F.3d at 909-10); *White v. Briley*, No. 03 C 1897, 2004 WL 1093343, at *9 (N.D. Ill. Apr. 28, 2004) ("[I]t is abundantly clear that both the Illinois and federal courts have determined that *Apprendi* is not implicated in consecutive sentencing claims") (collecting cases); *Hood v. McAdory*, No. 03 C 2709, 2004 WL 251830, at *1 (N.D. Ill. Feb. 02, 2004) (similar). The Supreme Court of the State of Illinois has reached the same result. *See People v. Wagener*, 752 N.E.2d 430, 441 (Ill. 2001) ("We find that *Apprendi* concerns are not implicated by consecutive sentencing. It is a settled rule that sentences which run consecutively to each other are not transmuted thereby into a single sentence."); *id.* at 443 ("Each of defendant's individual sentences was within the statutory range established by the legislature. This is all that *Apprendi* requires.").

In the instant case, the Illinois appellate court considered Garcia's argument and accurately considered Illinois law, represented by *Wagener*, whose holding, the Court has already recognized, is consistent with the Seventh Circuit's teachings. (D.E. 9, Ex. C at 24.) In Illinois, attempted murder is a Class X felony, punishable by a sentence of six to thirty years

30

imprisonment. *See* 730 ILCS 5/5-8-1(a)(3) (West 2000); *see also People v. Valentin*, 808 N.E.2d

1056, 1063 (Ill. Ct. App. 2004). Garcia's fourteen-year sentence for *two counts* of attempted

murder is well below the statutory maximum for either of the individual counts.[15] The state

court's decision was neither contrary to, nor involved an unreasonable application of, clearly

established federal law, as determined by the Supreme Court of the United States. It accordingly

affords no basis for habeas relief.

## IV.    Conclusion

For the foregoing reasons, Garcia's petition for a writ of habeas corpus pursuant to 28

U.S.C. § 2254 is denied.

So ordered.

Mark Filip
United States District Judge
Northern District of Illinois

Dated: 10/12/05

---

[15]       Petitioner made a related, and unavailing, argument in front of the appellate court
that in order to impose consecutive sentences, the trial judge was required to find that Petitioner
inflicted "severe bodily injury" on his victims. (D.E. 9, Ex. A at 34-35.) This argument is
unavailing; as discussed above, imposing consecutive sentences does not violate *Apprendi* as
long as the statutory maximum is not exceeded, which was not the case here. Moreover, as the
appellate court noted, the trial judge did find that Petitioner inflicted severe bodily injury. (D.E.
9, Ex. C at 23, 25.) The Court also notes that the finding of severe bodily injury is eminently
reasonable, given that Petitioner shot two victims, including Mr. Del Valle, who had to have one
of Petitioner's bullets removed from his spine. (*Id.* at 3.)